Good afternoon, Illinois Appellate Court, First District Court is now in session, the Sixth Division, the Honorable Justice Mary Mikva presiding, case number 2-0-0205, Uncle Tom's Incorporated versus Lynn Plaza, LLC. Thank you, Darren, and thank you, counsel. Could each counsel who's going to argue, please state your name and spell your name for the record and let us know who you're going to argue for beginning with the appellant. Good afternoon, Your Honor. Gary Weintraub, W-E-I-N-T-R-A-U-B for the appellant. Am I getting some feedback here or something? You are. Is there, do you have a solution, Jim? Lower the volume. It's a good, it was a good suggestion. Try again, Mr. Weintraub. See if it's better. How about that? Better? Yeah, I think so, maybe. I get closer? Yeah, when you get close, it's fine. Now I have feedback. Now I have feedback. All right, for the appellee. Good afternoon, Justice. My name's Mark Gross, G-R-O-S-S. I represent Lynn Plaza. All right. Your Honors, also with me at the council table is co-counsel for the appellant, David Epstein. All right. The counsel who are going to argue, you each have 20 minutes. Mr. Weintraub, would you like to reserve any of that for rebuttal? Five, if I might, Your Honor. Certainly. Whenever you are ready. Thank you. May it please the court, counsel. In Illinois, the law is settled that a landlord cannot charge a tenant for management expenses as part of common area maintenance, or what's commonly called cam charges, in the absence of express authorization in the lease. Kay's Merchandise Mart, a 2005 case, is the seminal case. There, the appellate court noted that management fees are different than the costs of operating and maintaining the common areas. And if I might quote the Kay's Merchandise Mart court, quote, language in the agreement requires the lessee to pay a pro rata share of all expenses for the operation and maintenance of the common areas. But that language- Mr. Weintraub, just to stop you for a second,  And doesn't that change the analysis? Well, there was an estoppel certificate in Kay's Merchandise and the court there found that it did not change the result. You're right, your honor. Here, the trial court did not reach the threshold issue, did not find that there was any express authorization in the lease. And in fact, here the lease contains a prohibition against charging for management fees. Instead, the court found or relied on, as your honor mentions, the estoppel certificate. Judge Hall seized on the 1998 estoppel certificate, which was not even addressed to the landlord, but to a prospective lender, which talked about prior events. And she applied it in futuro to charges made by the landlord years later, starting three years later in 2001 and running through 2010. But respectfully, your honor, there can be no estoppel here. Not a single element of an estoppel is satisfied. There is nothing, not a word in this estoppel certificate about management fees specifically, or even about cam charges in general, as distinguished from Kaye's Merchandise Mart, where cam charges in general were mentioned in the estoppel certificate, and the appellate court concluded there that it still wasn't enough. Not a single element of an estoppel is satisfied here, and there was no detrimental change in position by the landlord based on any statement made by the tenant. I'm gonna stop you just for a second again, because I think Kaye's Merchandise is very specific about the lack of knowledge that the tenant had when they signed the estoppel certificate. It sort of followed the general reasoning that an estoppel certificate generally is going to keep this kind of challenge from being made, but said not in that case because of the specific situation there, which was that the tenant really was not on notice as to the fact that they were paying these cam charges. Your Honor, respectfully, if we're talking about lack of knowledge, there's two things here. There's not a word in this estoppel certificate about management fees or even about cam charges. So to suggest that we were waiving, and that would effectively be treating this estoppel certificate as if it were a waiver. And a waiver requires knowing an intentional relinquishment of a right. And it just cannot be, Your Honor, that this tenant was knowingly and intentionally relinquishing something that is not even mentioned in the estoppel certificate. And if this is applied going forward, which is what is at issue here, to charges after the date of the estoppel certificate, you would be changing the lease by waiver, but that's a contract amendment. There is simply no predicate language in this estoppel certificate. No mention of cam, no mention of management fees, which could support any changes in the agreement of the parties going forward post estoppel certificate. And again, this landlord is not even a party to the estoppel certificate. So you can't effectively amend the contract going forward by an estoppel certificate, which does not mention management fees. Council, can I ask you, as far as the estoppel certificate again, does estoppel apply generally, or does estoppel only apply to the one that signed it from later claiming a different fact? It applies only to facts that exist at the time. And again, Your Honor, we didn't say or represent anything in the estoppel certificate about management fees or even about cam charges. I mean, it's the heart of unfairness to say that we're a stop because an estoppel certificate for a proposed lender is submitted to us, which talks about your base rent being paid. And that's all it says, nothing about cam charges, and that we're forever then foreclosed from disputing charges that aren't authorized by the lease. There are no other questions on management fees. I'd like to turn to the second piece of this appeal, the charges for the use of the com-ed portion of the shopping center property. Before I go to that, Your Honor, I wanna point out that for the first 50 years of this, for the first 18 years of this 50 year ground lease, where our building is on the landlord's property, the consistent practice was that there were no charges included in cam charges for management fees. But then 19 years into the lease, new management, new ownership came in and decided that they could and would start charging for management expenses. When they started doing that in 1997, the management expenses were only $1,569 a year. But by 2008, they grew to $4,673 a year. For that same year, 2008, the base rent, base ground rent for the whole year was $33,328. So the management fees charged amounted to a 14% rent increase for the year 2008, just like the case court was worried about. Moving to the ComEd portion of the appeal. The landlord charged this tenant for the landlord's cost of acquiring surface use rights for parking from Commonwealth Edison. On this, the landlord is triple dipping. The right to use the ComEd parcel for the purpose of parking is included in the tenant's base ground rent. On top of that, the landlord is charging the tenant for its cost of acquiring the use of the land as part of its cam charges. But the lease, section 32C, explicitly prohibits charging of parking fees by the landlord. Quote, under no circumstances, can lessor charge lessee, its customers and employees any fees for parking. And then the landlord rented out the ComEd parcel to the auto dealership across the street, thereby depriving the tenant of what it was paying for twice.  The landlord is charging $948 as part of cam for the landlord's cost of acquiring the surface use rights from ComEd. That's an additional 8.84% of the annual ground rent. So when you add the management fee charges plus the ComEd charges, those two items alone, apart from all the other common area charges, amount to an almost 23% increase over and above the base rent. Now, when you look at the language of the common area clause on which the landlord relies, the landlord relies on the word leasing. But respectfully, I submit that that refers to an activity as opposed to the word lease. Which refers to a legal instrument or a legal relationship. This landlord is trying to treat the word leasing as if it said lease. Council, you only have a few minutes left and I'd like you, before you're done, I'd like to know if you're planning to address the purpose clause and the eviction action. Yes, and I'm gonna move on quickly. Leasing is the landlord's business. In that context, it is hard to see how the word leasing can refer to anything other than an activity, not the landlord's land acquisition cost. And if there's any ambiguity, the subtle rule is in the lease context, the lease must be construed most strongly against the landlord in favor of the tenant. All right, video gaming. As to video gaming, this lease contains both a general purpose clause and a specific use and specific use rule for the premises. The purpose clause, lessor leases to lessee for the purpose of conducting there on a restaurant and liquor lounge business and for no other purpose. In Illinois, video gaming cannot be an, quote, other purpose. It is only permitted in licensed liquor establishments that serve liquor for consumption on the premises. Video gaming cannot be a freestanding or independent business. In Illinois, video gaming is now statutorily part of the buy the drink liquor business. The legislature has expanded the bar and liquor lounge business in Illinois. Counsel, given your argument, which is that basically legally it can't be a new purpose, what was the reason for a trial? Well, you'll have to ask Judge Hall. We moved for summary judgment. Mr. Gross moved for summary judgment. She thought there was an issue as to which she wanted to hear evidence. We believe that turned in part on the extent to which the income that the restaurant and liquor lounge was receiving from video gaming as compared to its overall income. And respectfully as to that, she just made a mistake and concluded that we received approximately the same amount of income from video gaming as we did from the sale of food and liquor, respectfully. And we set that forth at page 45 and six of our opening brief. The undisputed data shows that she was off by a factor of 10. That we receive only about 10 to 11% of overall income. What she didn't take into account was where the money that comes into the machines goes and how much this tenant received. But it would be your position that really no trial was necessary. You should have won that aspect of the case as a matter of law, is that? I do believe that, Your Honor. And I do believe those numbers also should have been, they're not disputed. There's no question that the machines took in approximately $1,200,000, but then the players took out 800,000, which she didn't take into account. And as to the 300 that's left, we only get about a third. Got it. The only other comment I would make is, Your Honor, as to attorney's fees, when I submit the court shouldn't decide those issues until the court decides who ultimately prevails on each count. There is an interesting threshold issue as to the application of the fee shifting clause in this lease to declaratory judgment actions. And as to that, Judge Hall took inconsistent positions. She found that this fee shifting clause did not cover declaratory judgment actions and denied fees as to count one, a declaratory, but then awarded fees as to three and four, also declaratory actions. So that's a threshold issue. With that, I'll reserve. Thank you. Thank you, counsel. Mr. Gross. Thank you. I'm sorry, before I turn it over, do either of the other justices have any more questions for Mr. Weintraub? No, thank you, Justice. I do, quick question. Mr. Weintraub, your opponent seems to suggest that there was no objection made by you to the attorney's fees. Is that true? I didn't hear him suggest that, and we objected at every step of the way, Your Honor. In fact, we had, I think, 12 or 14 months of proceedings on attorney's fees. Thank you. Mr. Gross. Thank you, Justice and counsel. May it please the court. It's hard to look at this case and wonder how it has taken nine years to get to this point. This is not a complicated case, no matter how hard Uncle Tom's has tried to make it so. It involves nothing more than the interpretation of the 1978 35-year term written commercial ground lease. Just months before its deadline for exercising its option to extend the lease term another 15 years, and subject to a determination through arbitration of what the fair rent was going to be for that option period. Uncle Tom's filed this lawsuit seeking a declaratory judgment that it should only pay rent on a little more than a third of the lease premises, and at rates that the fair market rate provision wouldn't even apply to. Count two, which is addressing the cam issues seemed to only be a throw in, adopting all of the allegations of count one, including paragraph 10, in which Uncle Tom's objected to a real wide variety of various expenses. We supplied Uncle Tom's through discovery with all of the financial backup, including receipts of all of the cam invoices that they were submitted. And then thereafter Uncle Tom's abandoned all of the claims with respect to the cam expenses to which it objected, with the exception of the com-ed expense and the property management fees. Now, section 32 of the lease is fairly clear on the inclusion of these expenses. At section C it states, and I quote only the relevant portion here, the common area for purposes of this lease is defined as those areas in the adjacent Lynn Plaza shopping center and the adjacent Commonwealth Edison right-of-way under lease to lessor. And then further into it, as far as what it constitutes as appropriate costs to be billed as part of cam, section 32 states, such costs shall include, but not be limited to labor, supplies, equipment, and all expenses of repairing, leasing, cleaning, sweeping, snow removal, painting of parking lines, et cetera, et cetera. Now, Uncle Tom similarly argues that the property management fees are not properly included in cam, conflating property management fees with quote, fees for the management of common area funds. Those are two very different things. And the latter of which is actually prohibited under section 32C, but not the former. In fact, section 32C specifically states that the lessee agrees that the cost of maintaining and operating all areas of the facilities as here defined shall be apportioned among the various tenants, including the lessee. Are you not relying on the estoppel certificates? Are you just- Quite heavily so Justice McBeth. There are three independent bases for affirming the award of judgment in favor of the landlord on count two. One of which is the estoppel certificate. One of which is the clear language of section 32. And the third of which, which I think is even more compelling is the custom and course of dealing that the parties had adopted over the course of these many years. So even if section 32 is not clear on the inclusion of these expenses in cam, more important than the interpretations that are advocated by the attorneys here is the interpretation adopted by the parties themselves. And as the case law cited in our brief holds, it's a familiar rule of constructions that where the terms of an agreement are in any respect doubtful or uncertain and the parties to it have by their own conduct placed a construction upon it, which is reasonable, such construction will be adopted by the courts in the event of litigation concerning it. And we know from the record that Uncle Tom's paid the ComEd leasing expenses without exception since at least 1989. And we only can go back that far because that's as far back as the previous management company had records. And it also paid the property management fees for over a decade before filing the suit. And it did so without objection with the exception of three years. The very first year we did so, which was 1998. And what happened in 1998 is after Uncle Tom's received Lynn Plaza's January 20, 1998 CAM invoice for the reconciliation charges, it hired an attorney who then wrote to us objecting specifically to the inclusion of those property management charges in CAM. This speaks directly to your questions and your comments earlier, Justice Mikva about the knowledge issue that was found so important in Kay's merchandise mark. What that case turned on was the issue of knowledge. And in our view, Kay's strongly supports Lynn Plaza's position, not Uncle Tom's. The entirety of the reasoning applied in the Kay's case was based on whether the tenant in that case could be charged with knowledge of the landlord's inclusion of management fees in its CAM charges when the tenant signed the estoppel certificate. And the court wrote, quote, should Kay's have known of its obligation to pay management fees when it signed the estoppel certificate. And although the Kay's court let the tenant off the hook in that case, it did so only because the court was persuaded that the tenant wasn't aware of the management fee when it signed the estoppel certificate. Finding, quote, the events prior to the execution of the estoppel certificate did not rise to the level that Kay's should reasonably have known of the management fee, end quote. Well, it is indisputable that we have the exact opposite facts here. Not only did Uncle Tom's know of the management fee when signing the estoppel certificate, it's proof of that is apparent through its engagement of an attorney who wrote a written objection to that element being included in the CAM expenses six months before it executed the estoppel certificate. And under Kay's analysis, as you pointed out earlier, Uncle Tom's is bound by its estoppel certificate as that court stated the law to be, quote, a party who executes an estoppel certificate should not be allowed to raise claims of which it knew or should have known at the time the certificate was executed. Now, we are not trying to apply this prospectively as Mr. Weintraub argues. What we are doing with the estoppel certificate, and I think what Judge Hall found is that it is the category of expense of the property management fees and the ComEd lease expenses that are included in the CAM, or I'm sorry, included in these CAM invoices, which the tenant was aware of at the time it signed the estoppel certificate. So to that- Well, what about the fact, as Mr. Weintraub brought out, that they increased so significantly between the time of the estoppel certificate and the current time, even though they are, yes, you're right, the same category. So obviously you can only be estopped as to the category, but what if that category of expenses changes so significantly? Is there any limitation? Well, I think that there's also in the record here something that Mr. Weintraub didn't point out, which is that Lynn Plaza issued credits. Every year that it issued these CAM reconciliation invoices, it issued credits to tenants, including Uncle Tom's, of varying amounts and thousands of dollars often. So there was adjustment made by the landlord in these invoices that were going out. And the reality is there were certain expenses over the course of the ownership of the property that definitely grew. Some of them may have been snow plowing in one year. I was involved in some litigation over that with this tenant, which obviously is outside the record. I'm sorry, not this tenant with this landlord, but the cost of operating the facility, the operating the property did substantially increase. And those were reflected by increased amounts over a very long period of time. And that long period of time is worth noting here because at no point, including in 2000, when Uncle Tom's failed to pay its property management fees when issued that invoice, Lynn Plaza issued a five-day notice and commenced an eviction action. At no time did Uncle Tom's contest that proceeding. It didn't file its own case contesting this. And we then wait until more than a decade later. And I believe that under the circumstances, Judge Hall was persuaded that the doctrine of laches should apply to this circumstance. This was a known claim and it was one that was not brought. And clearly Uncle Tom's allegations notwithstanding, Lynn Plaza relied to a great deal on what income stream it was getting from not just rent, but also from what was coming in to compensate it for the expenses of operating the facility. And had these claims been brought sooner, there would probably not have been the kinds of credits that were issued. There probably would have been less willingness to forgive certain late payments. There probably would have been less willingness to agree to rent abatements and new leases and so forth. Because the bottom line is a shopping center is operating as a for-profit enterprise and it needs to make money. Now, if you'd like, I can certainly answer any questions related to these CAM and property management fees, or I can move on to another issue. Unless there's an objection from the other judges, I would like you to move on to the purpose clause and the eviction action. Okay. Any objection from anyone else? Thank you. Judge, the purpose clause states quite clearly that the use of the property is, quote, for the purpose of conducting a restaurant and liquor lounge business and no other purpose. It's baffling to me that to this day, we continue to debate whether the use of the property for operating a restaurant and liquor lounge is not somehow obviously different than using the property to operate a gambling enterprise. The court was called upon in this case to interpret section one, to determine whether gambling in the form of video gaming was a permitted use. And the law on contract construction is pretty clear, which states in one of the cases we cited in our brief as follows. It is axiomatic that a court's principal goal in construing a contract is to ascertain and give effect to the party's intent at the time they entered into the contract. That's Shields Pork Pies versus Swiss Valley Egg Services. It's all right. We're very familiar with that concept. I would have expected so. But let's look at the language of the contract and it talks about purpose. And purpose is different, isn't it, than use. The purpose always was a bar and restaurant. That never really changed. And if the bar added cigarette machines or the bar added various activities, a trivia night, and in this case, video gaming, the purpose remained a bar and a restaurant. And isn't that different than use? Well, I will point out to your honor that the heading of the paragraph, section one of the paragraph, is titled demise descriptions and use of the premises. So to the extent that the body of the paragraph uses the word purpose, what it's defining is what is the permitted use of this property? And we may be talking more semantics here, but I think that one of the points that you're getting to is did the use change? Did the purpose change? No, the purpose doesn't appear to have changed in the event to the extent that what they did was they continued to operate a bar and a restaurant, but they certainly added a tremendously different use of the property, a tremendously different purpose of the property. One that had they done prior to or during 1978 would have been deemed illegal. And you're never allowed under this lease to do illegal activities. So they couldn't have done that in 1978, but in 19, whatever, 2011, I think it became legal. At some point it became legal to do this. Well, it became legal in some places. The state certainly passed a statewide permissive use of various qualifying establishments. And it's not just bars. It included fraternal organizations and truck stops and veterans associations and that sort of thing. But judge, one of the problems that we have with that approach is this. Let's suppose instead of video gaming, the state next year decides to legalize prostitution. And the prostitution is then going to be regulated by another separate state agency. And it's going to be permitted in bars and truck stops and fraternal organizations subject to those institutions qualifying for various forms of eligibility guidelines set forth in some regulatory scheme. Now is simply because those activities would be deemed to be centered around or run through establishments like bars make a landlord obligated to take that on as a permitted use under a use clause like what we have in this case. And I think that's absolutely absurd. And I think in 1978, when the parties entered into this lease and according to the case law, it is what their intention was at that time that is relevant. And it would be unfair to require that a landlord and a long-term lease who specifies a specific purpose for which that property is going to be used be anticipating all forms of conduct that might be legalized within those establishments in the future. And I don't think that was intended. It wasn't, well, just going back to the language of the clause, it's trying to control the purpose for which this lease is going to operate. It's not, doesn't appear to me and just tell me if we're missing something to be a control on every activity that happens there. That appears to me in a different clause. Well, if you're referring to the section five. I'm sorry. I'm sorry, I spoke over you. No, no. Your original intent seems to me that it, I mean, and that's what you're basically saying. If something wasn't contemplated at the time, it wasn't permitted at the time that this was entered into that it can't be anything that happens at this bar and restaurant. Is that your argument? No, I don't think so. I think it's more nuanced than that. I think what I'm arguing is that according to the law of contract construction, it's what did these parties intend when they contracted in 1978 for what the purpose of this lease would allow. And there's a lot of things that can go into that and what the parties think of, particularly a landlord. The type of clientele that would be brought into a facility, a family style restaurant and liquor lounge is one thing. A gambling house might be something completely different. And- How can we talk about intent when legalized gambling wasn't even a thing when this contract was entered into? How could we know what was in their minds considering that? Because it wasn't even allowed anywhere. And how can we- I agree, but I think Justice Connors, I think you're making my point for me. That the parties could not have reasonably contemplated or considered that legalized gambling would be permitted use or purpose for which this property would be used because it was illegal. Just as the example with prostitution or perhaps legalized narcotics sales or anything else. Let me ask, as far as contract construction, do we usually use what the heading says or do we use what's in the body of the paragraph? I agree with your honor. The body of the language would control over the headings. But I do think the headings give some flavor to what the parties intended for the body to actually say. Let me ask you one more question. Your opponent cites to Amjur and saying that these kinds of clauses should be constructed more permissive rather than restrictive. You disagree with that? I think that that would make tremendous sense if the provision was somehow ambiguous or required some interpretation that would bring into question whether we are applying it too narrowly. And I don't believe that we are at all. Council actually tested this theory in another case before this court years ago that involved a different type of business. It involved a business that was in the business of providing beauty aid products to the public through a retail establishment that started selling many other things, motor oil, radios, things of that nature. And the landlord objected and said, under a very similar use clause as the one here. And this is the Baird Warner case we cited in our brief that it is not overly narrow for it to construe that the use clause prohibited the sale of these extraneous items. And just because other beauty aid stores sometimes sold those kinds of goods, that didn't somehow expand this use to be a custom in that industry. So- So would you make the same argument if, I think it was stated that there was this claw game that people play and you put money and you try to get a dollar out of it. Was that kind of thing be objectionable as well? In a restaurant? No, and that now we're getting more toward what the actual scope of the use of the place was, Judge. And those types of video arcade games were what were issue at the Indiana case in Ray Run that Uncle Tom cited that led us kind of down an entire rabbit hole of additional litigation in this case, where a pizza establishment in Indiana was deemed to have an ancillary use where they allowed the playing of some arcade games like what you're describing or Pac-Man and things of that nature. But what came, what was important in that case and one of the points that I think council is touching on here is the volume at which the operation of the video gaming terminals here seem to overtake its other business operation. And if we look simply to the really broad numbers because Mr. Weintraub and I disagree as to these apples to apples and oranges to oranges comparisons, if we simply look at what's on its tax returns and in 2013, before it actually introduced BGTs to the business, Uncle Tom's lost $26,000 from food and beverage sales. And in 2014, the first year that it introduced BGTs and it only did so for nine months of the year, it still lost $76,000 from food and beverage sales but made a profit of $110,000 on its video game. In 2015, the first year that it operated BGTs for a full month period, for a full 12 month period, its food and beverage sales generated a loss reported on its income tax returns of $112,578. Yet its gain, its profit from video gaming was $166,000. Now there can't be any confusion of these as being somehow ancillary like a claw game or an arcade game to his business. This became its dominant business under absolutely no stretch of the imagination did this comprise merely an incidental use. What about use of the property? He claims there's only 2% of the property that was being used for this. Does that come into the analysis? Well, yeah, I mean, that's somewhat interesting because what he's comparing there is the square footage that was devoted to the restaurant, to the building space, to the space being used by the video internals. That does not seem to be a particularly relevant inquiry of what we're looking at is, does video gaming constitute more than merely an ancillary or incidental addition to the purpose for which this property is being used? It does not, it dominates. They even increased their hours of operation to be open an additional two hours just for video game. And their advertising at place, the video gaming was getting top billing even over their food and beverage sales and their print advertising. So we strongly disagree that there could be a good faith argument made that the video gaming was merely an add-on that played no significant role in changing the nature and operation of this business. You're out of time, but I wanna ask you one last question about attorney's fees, which is if it should happen that we would reverse in part of this case so that you were the prevailing party on the only one, as opposed to both of the claims, would it be your position that we should reduce the attorney's fees, vacate the attorney's fees, award attorney's fees to both sides? What do you think would happen to the attorney's fees in that case? Well, this is a difficult question for practical concerns because of the pending bankruptcy. As a practical matter, I don't think it's going to matter much what the attorney's fees turn out to be in terms of the award here based on the schedules that were filed in the bankruptcy proceeding. But we believe that if there's a determination that goes back to the court as to a reversal on part of the case, which would be either on count two or count three, it would have to go back to Judge Hall to determine who's the prevailing party. What's important is how this case was initiated. And it was brought as counts one and two seeking to avoid the arbitration of the fair rent provision. And then a determination as to these CAM expenses kind of as an aside. It became a case that gained a completely different tone after the video gaming issue rose. And it wasn't brought as a separate act. We brought a separate eviction action and it was not consolidated, but the case, the eviction case was staying pending the outcome of Judge Hall's determination on the video gaming. I don't know if I answered your question directly, Justice- Well, not completely, but you raised another question that I need to ask you and the other side. Is there any reason we, given the bankruptcy, is there a reason we shouldn't be proceeding here? Is there a problem with our proceeding given the bankruptcy? No, I mean, the stay doesn't reach that. And what we did in the bankruptcy case is we worked out an agreed order to lift the stay so as to allow us to get possession of the premises after Uncle Tom's ceased operating and vacated the space. And in that order, we specifically provided that it was without prejudice to Uncle Tom's continuing to prosecute this appeal. Okay. All right. Can I ask you as far as the issue of, sorry, of fees for fees, did Justice Hall specifically address that in a ruling? I know you argued with the briefs, but did she address the issue of fees for fees? It certainly was raised by Mr. Weintraub in the objections to the supplemental fee petition that we filed. And keep in mind that supplemental fee petition was brought nearly two years after our original fee petition. We had almost two years of litigation on just the initial fee petition. And it certainly was raised by Mr. Weintraub. I don't believe Judge Hall's decision, her written decision on that specifically addressed it. We have addressed it at some length in our briefs. Right. But let me ask you this, did the trial judge make a specific ruling relative to Mr. Lyon and that work? I mean, to me, it's unusual. When I used to look at fee petitions, I rarely approved for some other lawyer reviewing the work of the lawyer who was working on the case. Did Judge Hall comment on that at all? She commented on two things. She commented on Jeff Lyon, who I'm sorry to say sadly passed away in early December from some illnesses. But she addressed the objections that Mr. Weintraub raised as to whether he was of record and agreed with us that there was simply no legal authority holding that an attorney who did not file an appearance in the case could somehow not be included in a fee petition seeking compensation for their time and assisting in the representation of that client in that proceeding. As far as the work that Mr. Lyon did, it would be unfair to characterize the work that he did as simply reviewing my work. There was substantial entries, which are contained in the record of Mr. Lyon performing their own research, their own analysis, their own communications and conferences with the client. And it certainly is not unheard of in this age. And I think as is the case with even Mr. Weintraub and Mr. Epstein, there's some collaborative effort that goes on between both sets of attorneys on both sides of this case that are helpful and valuable to the appropriate representation of our clients in these matters. Thank you. If there are no more questions, Mr. Weintraub, you may do your rebuttal. Very briefly, Your Honor. As to Estoppel and Mr. Gross's argument regarding knowledge, my question is knowledge as to what? The tenant obviously has knowledge as to many things, but represented nothing in this Estoppel certificate about management fees or CAM charges. So knowledge is entirely irrelevant here because the certificate that the tenant signs says nothing about either of those subjects. With respect to Mr. Gross's comment on credits, I would refer the court to the CAM statements that were sent to the tenant each year, which are in the record, in the common law record at 777 and 1497 and the pages around them. None of these credits had anything to do with either management fees or CAM charges. We never got any credit for any of that. They were other issues that were in dispute between the parties. Mr. Gross's comment with regard to laches, Judge Hall didn't find laches and laches doesn't and wouldn't apply here. With respect to the numbers and the comparison for video gaming purposes about how much the establishment takes in, Mr. Gross now points to profits, not what the machines generated, and that's a non sequitur. I point out, yes, this was not the most profitable restaurant in the county or the state, but without these machines and every other restaurant in Wheeling primarily had them. There were 17 other restaurants and liquor lounges in Wheeling with video gaming and we were still barely making it. Yes, the video game machines, the five terminals generated money for the restaurant. They generated about 100,000 a year, not a million two as Judge Hall found. And without it, in today's climate with video gaming all over the place, an establishment such as this can't be competitive. As to fees on fees, as your honor pointed out, we did object strenuously. We think it's outside the scope of this fee shifting clause. Judge Hall didn't give a reason specifically, but rejected our objections and awarded fees on fees. As to the Baird and Warner case from 1988 that Mr. Gross cited, I gotta tell you that that was Baird and Warner versus Alpar. Alpar was one of the nicest men I've ever met, and I'm sorry to say he's gone too, but that case had nothing to do with this case. There was no issue of a new activity being legislatively made part of a particular business there as there is here. And finally, as to Mr. Lyons, what the record shows is the reason that he did work was because the landlord requested as a general practice that he review every case that was in litigation. The landlord testified, record at 2321, or actually Mr. Lyons testified. As a general rule, our client has requested that if Mark prepared something for anything they're working on regarding the lawsuit, any lawsuit that we review it, that shouldn't be a basis for awarding fees. And if it is, I think lawyers are gonna be submitting a lot more of these things. So with that, I would respectfully request that the court reverse or enter any other order that may be appropriate. Thank you both. We will take this better under advisement. Thank you both for your participation and for your work on this interesting case. Thanks.